IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| E.O., individually and on behalf of E.L., a minor<br><br>Plaintiff,<br><br>v.<br><br>PREMERA BLUE CROSS,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:23-CV-00443-TS-JCB<br><br>District Judge Ted Stewart<br>Magistrate Judge Jared C. Bennett |

This matter is before the Court on Plaintiff E.O.'s Motion for Summary Judgment and Defendant Premera Blue Cross's Motion for Summary Judgment. For the reasons discussed hereinafter, the Court will grant Plaintiff's Motion and deny Defendant's Motion.

## I.  BACKGROUND[1]

E.O. is a participant in an employee welfare benefit plan (the "Plan").[2] E.L., E.O.'s son, was a beneficiary of the Plan at all relevant times. Premera Blue Cross ("Premera") was the insurer for the Plan at all relevant times.[3] In third grade, E.L. was diagnosed with ADHD and dysgraphia, prescribed medication, and began therapy.[4] As E.L. prepared to enter high school, his mental health began to deteriorate, which significantly impacted his performance in school.[5] As a result, E.L.'s parents enrolled him in a high school with a program developed specifically for boys with ADHD and executive functioning challenges. However, E.O. described E.L.'s first

---

[1] The following facts are taken from the medical record, the Complaint, and the parties' briefing.

[2] Docket No. 1 ¶ 4.

[3] *Id.* ¶ 2.

[4] *Id.* ¶ 12.

[5] *Id.* ¶¶ 12–13.

high school as "completely ineffective."[6] E.L. continued to struggle and would experience severe and debilitating panic attacks to such a degree that, on several occasions, he physically could not get himself to go into school.[7] Despite the specific program tailored to support him, E.O. stated that "[E.L.] was smart enough to evade almost every rule and boundary that was designed to support him."[8] E.L.'s parents then enrolled him in a special one-on-one school.[9] E.L. continued to struggle, however, especially after school was moved entirely online due to the COVID-19 Pandemic. E.O. stated that "[w]e could plainly see that E.L.'s mental health was declining at a frighteningly rapid pace."[10] E.L.'s parents then enrolled him in another high school. But E.L.'s mental health struggles continued and he started failing classes and often refused to attend entirely.[11]

Since the start of high school, E.L. visited with three different therapists. When he participated, he would only discuss superficial topics, and eventually started to refuse to attend therapy altogether.[12] When E.L.'s parents tried to place limits, he would often become violent and aggressive.[13] E.L. also reported frequent thoughts of suicide.[14]

Dr. Samuel L. Judice, M.D., E.L.'s psychiatrist from mid-2016 to January 31, 2022, recommended a 24-hour inpatient program and told E.L.'s parents that outpatient treatment

---

[6] Docket No. 52, at 49 (SEALED).

[7] Docket No. 1 ¶ 15.

[8] Docket No. 52, at 49 (SEALED).

[9] Docket No. 1 ¶ 15.

[10] Docket No. 52, at 50 (SEALED).

[11] Docket No. 1 ¶ 19.

[12] *Id.* ¶ 16; *see e.g.*, Docket No. 52, at 51, 53 (SEALED).

[13] *Id.* ¶ 17; *see e.g.*, Docket No. 52, at 51 (SEALED).

[14] *Id.* ¶ 18; *see e.g.,* Docket No. 52-4, at 100 (SEALED).

would be unsuccessful given the severity of E.L.'s condition.[15] This recommendation was confirmed and reiterated by Dr. Alison LaFollette, Ph.D.,[16] who conducted a psychological evaluation of E.L. on December 10, 2021. Dr. LaFollette additionally diagnosed E.L with Social Pragmatic Communication Disorder, Persistent Depressive Disorder, and Generalized Anxiety Disorder. Kristian Kemtrup, E.L.'s therapist until November 2020, and Alexandria Adeosun, E.L.'s educational consultant, also recommended residential treatment.[17]

E.L. attended blueFire, an outdoor behavioral health program, from February to April 2022. Upon discharge, E.L.'s therapist at blueFire noted that E.L. had made improvements regarding behavior techniques and communication patterns, but also that "he continue[d] to struggle with . . . anxiety, developing internal motivation, and expressing emotions effectively."[18] She stated the "[t]reatment team recommendation is [that E.L.] transition to a residential treatment setting" in order "to maintain a positive trajectory."[19] Otherwise, "E.L. [was] at continued risk for maladaptive behavior and functional decline."[20]

---

[15] Docket No. 52-4, at 204 ("Thus, in my professional opinion, [E.L]. needs a residential treatment.").

[16] *Id*. at 118 ("It is strongly recommended that [E.L.] attend a clinically sophisticate[d] therapeutic boarding school that can assist with his depression, anxiety, and social pragmatic communication disorder.").

[17] *Id*. at 209 ("It is my professional opinion that [E.L.] . . . need[s] a more higher level of comprehensive care."); *Id*. at 207 ("[W]e identified residential treatment programs that sought to meet [E.L.'s] complex mental health needs . . . [and] recommend[ed] that he does not return home and instead be in a structured environment.").

[18] Docket No. 52-1, at 92.

[19] *Id*.

[20] *Id*.

Taking blueFire's recommendation, E.L.'s parents admitted E.L. into Gateway on April 22, 2022, for which they sought pre-authorization from Premera. Premera issued its first denial letter (the "First Denial Letter"), dated April 22, 2022, which reads:

> We received a request for the service listed below and have found the service doesn't meet admission guidelines for coverage. . . .
>
> Our decision: The treatment guidelines we use state that residential treatment for a mental health condition is medically necessary when, because of a mental disorder, a co-occurring substance use disorder, a serious emotional disturbance, autism spectrum disorder, or intellectual disability, all of these situations are true for you:
>
> - You are so functionally impaired that you can't follow instructions or ask for help to get your needs met, or you can't control your behavior for more than 48 hours.
> - You cannot be managed safely in the community because, for the last 6 months or longer, you have been repeatedly or continuously hurting yourself, or repeatedly or continuously hurting others, or repeatedly or continuously having behavior that was threatening to or could have hurt others, or repeatedly or continuously having behavior that was sexually risky or harmful, or repeatedly or continuously damaging property, or repeatedly or continuously getting arrested, or repeatedly or continuously running away to dangerous situations, or having very serious psychiatric symptoms.
> - Your support system is not available, or is unsafe, or is not able to manage your difficulties or keep you safe.
>
> Residential treatment for a mental health condition is denied as not medically necessary. Information from your provider does not show any of the situations above. Based on the information from your provider, lower levels of service, not residential treatment, would be considered to be the medically necessary levels of care for you.[21]

Plaintiff appealed on October 12, 2022. Plaintiff outlined E.L.'s medical history, highlighted specific portions of the blueFire and Gateway records, and attached letters of opinion and evaluations from Dr. Judice, Dr. LaFollette, Ms. Adeosun, and Mr. Kemtrup, all of whom opined that residential treatment was necessary. In her appeal, Plaintiff argued that E.L.'s

---

[21] Docket No. 52-4, at 15–16 (SEALED).

medical history and letters demonstrated that it was medically necessary for E.L. to be admitted into Gateway to receive residential mental health treatment.

Premera issued its second denial letter (the "Second Denial Letter"), dated December 29, 2022, which reads:

> Patient was diagnosed with Dysthimic [sic] disorder. They are not having thoughts of wanting to harm themself or others. They are not hearing or seeing things that are not there. They are able to follow instructions and ask for help to get their needs met. They have a support system. They do not have any severe behavioral issues that require around the clock nursing. They can be safely treated in a lower level of care.[22]

Plaintiff then filed this lawsuit requesting the Court reverse the denial of benefits for E.L.'s stay at Gateway from April 22, 2022, until October 4, 2022.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, when both parties move for summary judgment in an ERISA proceeding focusing on a benefit denial claim, the parties have effectively "stipulated that no trial is necessary" and thus "summary judgment is merely a vehicle for deciding the case."[23] In these instances, "the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[24]

---

[22] *Id*. at 524.

[23] *LaASMAR v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

[24] *Id.* (internal quotation marks and citation omitted).

### III.  DISCUSSION

Plaintiff brings two claims against Defendant. First, under the Employee Retirement Income Security Act of 1974 ("ERISA"), Plaintiff brings a claim for recovery of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).[25] Second, Plaintiffs bring a claim under the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"), as incorporated in ERISA.[26] Plaintiffs seek to recover the amount allegedly owed under the terms of the Plan for E.L.'s residential treatment at Gateway, attorney fees, and other equitable relief.

Plaintiff alleges that Defendant violated ERISA, breached its fiduciary duties, and otherwise deprived Plaintiff of a meaningful dialogue and a full and fair review. Plaintiff further argues that Defendant cannot, now in litigation, make new arguments, marshal new evidence, and otherwise "re-fashion its inadequate and defective pre-litigation process with an avalanche of new arguments and opinions."[27] Defendant contends that its claim procedures complied with ERISA and that Plaintiff failed to meet her burden of showing medical necessity.

ERISA sets the "minimum standards" for employer-sponsored health plans.[28] Among other things, ERISA and its governing regulations require a plan administrator, when denying a claim for benefits, to "set[] forth the specific reasons for . . . denial, written in a manner calculated to be understood by the participant," and on review of claimant's appeal of a denial "afford a reasonable opportunity . . . for a full and fair review."[29]

---

[25] Docket No. 1 ¶¶ 42–49.

[26] *Id*. ¶¶ 50–69; *see* 29 U.S.C. § 1185a.

[27] Docket No. 32, at 22.

[28] 29 U.S.C. § 1001.

[29] 29 U.S.C. § 1133(1)–(2).

In addition, "[a]dministrators . . . are analogous to trustees of common-law trusts and their benefit determinations constitute fiduciary acts."[30] "[I]n determining benefit eligibility, the administrator owes a special duty of loyalty to the plan beneficiaries."[31] "Although the insured ultimately carries the burden of showing [they are] entitled to benefits, the plan administrator has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim."[32] "While a fiduciary has a duty to protect the plan's assets against spurious claims, it also has a duty to see that those entitled to benefits receive them."[33] ERISA requires plan administrators to discharge their duties "solely in the interest of the participants and beneficiaries" of the plan.[34]

The Court finds that Premera violated ERISA and its fiduciary duties owed to E.O. and E.L., as set forth below. The Court also finds that in so doing, Premera acted in a manner that was clearly arbitrary and capricious and that a retroactive award of benefits is warranted.

   a.   *Reference to Specific Plan Provisions*

ERISA regulations require a plan administrator to provide the specific reasons for denial, including "[r]eference to the specific plan provisions on which determination is based," and any "internal rule, guideline, protocol, or other similar criterion . . . relied upon in making the adverse

---

[30] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)).

[31] *Id*. (internal quotation marks and citation omitted).

[32] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co*., 585 F.3d 1311, 1324 (10th Cir. 2009) (citing *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807–08 (10th Cir. 2004)).

[33] *Gaither*, 394 F.3d at 808–09.

[34] 29 U.S.C. § 1104(a)(1).

determination."[35] This information must be communicated "in a manner calculated to be understood by the claimant."[36]

Plaintiff argues that Defendant failed to properly explain its reasons for denial, including by failing to cite to specific Plan language. The Court agrees. The First Denial Letter fails to identify a specific plan provision upon which denial was based. The letter obliquely states that the review process was "based on accepted medical standards," and that "the service [requested] doesn't meet admission guidelines for coverage."[37] It also states that, in making this decision, Premera reviewed medical records from Gateway, InterQual criteria, and Premera's own internal policy, but makes no mention of or reference to the Plan. The letter also summarizes the symptoms needed to establish medical necessity under those guidelines and that the information provided does not show any such symptoms.

Defendant does not address a lack citations to the Plan but argues that references to materials reviewed are sufficient for purposes of citing to the record.[38] This argument was raised in a factually similar case in this District. There, a plan administrator "argue[d] the denial letters sufficiently identified plan terms by referencing an internal policy, indicating [the claimant's] request 'did not meet medical criteria,' and quoting the medical necessity provision of the plan."[39] The court, however, disagreed and concluded that the defendants "still f[ell] short in

---

[35] 29 C.F.R. § 2560.503-1(g)(1)(i), (ii), and (v)(A).

[36] *Id*. § 2560.503-1(g)(1).

[37] Docket No. 52, at 133 (SEALED).

[38] Docket No. 40, at 4.

[39] *Doe v. Intermountain Healthcare, Inc.*, No. 2:18-CV-807-RJS-JCB, 2023 WL 5395526, at *11 (D. Utah Aug. 22, 2023).

communicating the basis for the denial in a reasonably clear manner as required," which constituted "a serious procedural irregularity."[40]

Likewise, here, any discussion of or citation to the Plan is entirely absent. Premera provides no explanation as to how the referenced admission guidelines, including the InterQual criteria and Premera's internal policy, apply to the terms of the Plan.[41] Accordingly, the Court finds that Premera violated ERISA and acted arbitrarily and capriciously when it failed to reference the specific plan provision upon which the benefits determination was made in the First Denial Letter.

   b.  *Conclusory Health Statements*

Plaintiff alleges that Defendants made conclusory health statements without reasoning or citations to the record and thus did not provide a full and fair review. As above, ERISA regulations require a plan administrator to provide "[t]he specific reason or reasons for the adverse determination."[42] This means the administrator must "provide the claimant with a comprehensible statement of reasons for the . . . denial."[43] "In referring to a claimant's medical records, administrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[44] When denial is based on medical necessity, an administrator must provide "an explanation of the scientific or clinical judgment for

---

[40] *Id.*

[41] Premera's Second Denial Letter, however, does not suffer from the same deficiencies. It states that, in reaching its decision, Premera reviewed Plan language, and the attached independent review included references to specific Plan language. Docket No. 52, at 32, 34 (SEALED).

[42] 29 C.F.R. 2560.503-1(g)(1)(i).

[43] *D.K.*, 67 F.4th at 1242 (quoting *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003)).

[44] *Id.*

the determination, applying the terms of the plan to the claimant's medical circumstances."[45]

Again, this information must be communicated "in a manner calculated to be understood by the claimant."[46]

Regarding the First Denial Letter, Defendant argues that where the reason for denial is absence of symptoms, the plan administrator generally does not need to provide extensive citations to the record. The Court agrees. In *E.W. v. Health Net Life Insurance Company,* the Tenth Circuit concluded that the plan administrator complied with its obligation to provide specific reasons for denial where it "laid out the medical-necessity criteria that governed [the p]laintiffs' claim," and "applied clinical judgment in explaining that, based on medical records provided . . . [the plaintiff] was not experiencing any of those symptoms or behaviors."[47] The court reasoned that it is difficult to cite to evidence in the record for "the absence" of particular symptoms.[48]

Here, like *E.W.*, the initial denial letter summarizes the criteria that, according to Premera's treatment guidelines, are required to demonstrate medical necessity. The letter states that it reviewed E.L.'s medical records with Gateway and blueFire. The letter then states that "[i]nformation from [E.L.'s] provider [did] not show any of the situations [cited]."[49] At this stage, Premera did not have access to all of the information supplied on appeal, including provider opinions. Accordingly, because there was an absence of symptoms needed to support

---

[45] 29 C.F.R. § 2560.503-1(g)(1)(v)(B).

[46] *Id*. § 2560.503(g)(1).

[47] 86 F.4th 1265, 1299 (10th Cir. 2023) (internal quotation marks and citation omitted); *see also Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 589 (10th Cir. 2019) (concluding the same).

[48] *Id.* at 1301.

[49] Docket No. 52, at 46 (SEALED).

medical necessity, Premera properly complied with its obligations to provide specific reasons for denial in the First Denial Letter.

However, unlike *E.W.*, the Second Denial Letter was based, in part, on affirmative representations regarding E.L.'s health, as opposed to an absence of symptoms.[50] The Second Denial Letter makes the following specific health conclusions: (i) E.L. was able to follow instructions and ask for help to get their needs met; (ii) E.L. had a support system; and (iii) E.L. could safely be treated in a lower level of care.[51] But any citation to the record to support those conclusions is entirely absent. Likewise, Premera offers no explanation of clinical judgment regarding how it applied the terms of the Plan and InterQual criteria to those health conclusions such that denial was warranted. In short, a claimant receiving this letter would likely not understand the full reason for denial and would be left confused as to the basis for Premera's health conclusions and how the terms of the Plan and InterQual criteria apply to those conclusions such that denial was justified.[52]

Premera argues it cited the record by informing Plaintiff it based its decision on: documents and medical records supplied by Plaintiff, the contract with Gateway, provider medical records, InterQual, and Premera's internal policy.[53] This is not enough. "An administrator's explanation for a denial provided during full and fair review cannot merely

---

[50] *E.W.,* 86 F.4th at 1301 (explaining the difference between the holdings in *D.K.* and *E.W.* is that in the latter, the plan administrator's "findings derived primarily from the *absence* of record evidence supporting continued coverage," whereas in the former, the statements found to be "unsubstantiated . . . were primarily [affirmative statements that] the administrator could have supported with citations the beneficiary's medical records").

[51] Docket No. 52-4, at 524 (SEALED).

[52] *See* Docket No. 52, at 48 (SEALED) ("[I]t remains unclear to us what basis the reviewer has determined that [E.L.'s] treatment was not medically necessary.").

[53] Docket No. 52-4, at 524 (SEALED) ("We reviewed any documents and medical records that were sent to us.").

reference the claimant's evidence."[54] The independent review's conclusion, enclosed within the second denial letter from which Premera copied verbatim its reason for denial, likewise, lacks any supporting citations, reasoning, or explanation of its clinical judgment.

While the independent reviewer provides a select summary of E.L.'s clinical course at Gateway from the date of admission, that summary contains no information or reasoning that supports the conclusions that E.L. was able to ask for help to get his needs met, that he has a sufficient support system, and that he can be safely treated in a lower level of care. "These are statements that, if true, presumably derive from [the] medical records . . . and to which the administrator could have cited directly."[55] Accordingly, "given that [Premera] was provided with extensive information, its conclusory responses without citing the medical record, did not constitute a full and fair review."[56]

Therefore, the Court finds that Premera violated ERISA when it based its denial, in part, on affirmative health conclusions that lacked any reasoning or citation to the record, and thereby acted arbitrarily and capriciously.

c.  *Uniform Application of all InterQual Criteria*

Plaintiff also alleges that Premera failed to utilize and cite all relevant InterQual criteria that, if met, would demonstrate medical necessity.[57] "[A]n administrator acts arbitrarily and capriciously when it misapplies plan terms by adopting an unreasonable interpretation, or by

---

[54] *D.K.*, 67 F.4th at 1242.

[55] *E.W.*, 86 F.4th at 1301.

[56] *D.K.*, 67 F.4th at 1242.

[57] Docket No. 41, at 20–22.

applying the terms inconsistently."[58] But, a plan administrator may summarize the relevant criteria, even if it did not recite each criterion verbatim, so long as it did in fact consider all criteria relevant to medical necessity.[59] As above, this information must be communicated "in a manner calculated to be understood by the claimant."[60] The record suggests that Premera mischaracterized and unreasonably applied the InterQual criteria.

To establish medical necessity, InterQual requires evidence of symptoms within certain categories:

- Functional impairment severe, ≥ One:
    - Unable or unwilling to follow instructions or negotiate needs
    - Unable to maintain behavioral control for more than 48 hours

    …

- Support System, ≥ One:
    - Abusive
    - High-risk environment
    - Intentional sabotage of treatment while engaged in intensive community-based treatment
    - Unable to ensure safety
    - Unable to manage intensity of symptoms

- Unable to be managed safely within the community, ≥ One: (persistent or repetitive over at least 6 months)
    - Aggression unresponsive to adult de-escalation or direction
    - Angry outbursts causing harm to self or others or property
    - Daredevil behavior
    - Delusions
    - Disorganized thoughts or speech or behavior
    - Fire setting
    - Hallucinations
    - Hypomanic symptoms increased

---

[58] *E.W.*, 86 F.4th at 1298 (citing *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1263 (10th Cir. 1998); *Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020)).

[59] *Id.* (concluding that the plan administrator's "denial letters demonstrate that it did in fact consider all criteria relevant [to the claim] even if it did not recite each criterion verbatim").

[60] 29 C.F.R. § 2560.503-1(g)(1).

- o Persistent violation of court orders
- o Poor impulse control with harm to self or others and unresponsive to adult intervention
- o Repeated arrest or confirmed illegal activity
- o Repetitive behavior and unsuccessful in meeting treatment plan goals in less intensive level of care, ≥ One:
  - Aggressive behavior moderate without injury to another
  - Destruction of property without harm to self or others
  - Nonsuicidal self-injury and professional medical attention not required for injury
  - Runaway for more than 24 hours and places self in dangerous situations
  - Sexually inappropriate or abusive[61]

First, Premera states in the Second Denial Letter that it denied Plaintiff's request, in part, because E.L. has "a support system."[62] This mischaracterizes the "support system" criterion. Whether a support system *exists* is a different question than whether the support system is *adequate*—and InterQual is concerned with the latter.[63] A claimant may have a support system while also still meeting the relevant InterQual criterion if, for example, that support is unable to manage the intensity of the symptoms. Thus, stating that denial was based, in part, on E.L. having a support system does not fully capture the actual criterion and fails to disclose the full

---

[61] Docket No. 52-2, at 232 (SEALED).

[62] Docket No. 52-4, at 524 (SEALED).

[63] *Compare* Docket No. 52-3, at 6 (SEALED) (defining a support system to include social, emotional, caregiving, or other resources to provide empathy, structure and oversight) *with* Docket No. 52-2, at 232 (SEALED) (listing the type of deficiencies within a support system that would satisfy the support system criterion as: abusive, high-risk environment, intentional sabotage of treatment while engaged in intensive community-based treatment, unable to ensure safety, unable to manage intensity of symptoms, or unavailable); *see also* Docket No. 52, at 46 (SEALED) (Premera's first denial letter correctly described the evidence needed to satisfy the support system criterion as "[y]our support system is not available, or is unsafe, or is not able to manage your difficulties or keep you safe").

reason for denial. Premera also describes this criterion differently between the First and Second Denial Letters.[64]

Second, Premera stated that it denied Plaintiff's request, in part, because "[a]s of 04/22/22, [E.L.] was not reported to be actively suicidal, homicidal, or gravely impaired for self-care," and was "not having thoughts of wanting to harm [himself] or others."[65] Assumedly, Premera was applying the criterion of an inability to be managed safely within the community. But that criterion does not require evidence of suicidal thoughts or thoughts of wanting to harm himself or others. Rather, that criterion may be satisfied by evidence of "[a]ggression unresponsive to adult de-escalation or direction," "[a]ngry outburst causing harm to self or others or property," or, where less intensive level of care was unsuccessful because of either "[a]ggressive behavior moderate without injury to another," or "[s]exually inappropriate" behavior. Contrary to Premera's assertions, these are symptoms that are strongly supported by the record, as discussed further below.

Third, it appears that in determining medical necessity on appeal, Premera only considered evidence "as of 04/22/2022."[66] E.L. was admitted into Gateway on April 22, 2022, and the inability-to-be-managed-safely-in-the-community criterion used to determine whether *admission* is medically necessary requires that the behavior be persistent or repetitive over at least 6 months. In her appeal, Plaintiff argued that E.L.'s provider opinions and medical history leading up to admission sufficiently evince an inability to be managed safely within the

---

[64] Docket No. 52, at 46 (SEALED) (describing in the First Denial Letter the evidence needed for the support system criterion: "[y]our support system is not available, or is unsafe, or is not able to manage your difficulties or keep you safe").

[65] Docket No. 52-4, at 532–33 (SEALED).

[66] *Id*. at 533.

community. Thus, by limiting its review of evidence "as of 04/22/2022" and onward, Premera applied an unreasonable interpretation of the InterQual criteria by improperly narrowing the scope of the evidence considered, the result of which was the categorical exclusion of virtually all of Plaintiff's evidence. This unreasonable application also violates ERISA's requirement to "[p]rovide for a review that takes into account all comments, documents, records or other information submitted by the claimant" on appeal,[67] and reflects Premera's failure to provide a full and fair review, as discussed in detail below. Accordingly, the Court finds that Premera applied InterQual criteria in an unreasonable manner and thereby acted arbitrarily and capriciously.

    d. *Failure to Engage in a Meaningful Dialogue with Provider Opinions and Provide a Full and Fair Review*

Perhaps most egregiously, the Court finds that Premera blatantly failed to consider, engage with, or even acknowledge the letters from E.L.'s clinicians who opined that residential mental health treatment was medically necessary.

On appeal, a plan administrator must provide a claimant with a "full and fair review" of the claim and the adverse benefit determination.[68] This includes conducting "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim."[69] "For the claimant, then, the full and fair administrative review required by ERISA means knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider

---

[67] 29 C.F.R. § 2560.503-1(h)(2)(iv).

[68] 29 U.S.C. § 1133(2).

[69] 29 C.F.R. § 2560.503-1(h)(2)(iv).

the evidence presented by both parties prior to reaching and rendering [the] decision."[70] In other words, there must be a "meaningful dialogue between ERISA plan administrators and their beneficiaries,"[71] which requires "an ongoing, good faith exchange of information."[72] "A 'good faith exchange of information' presumes that the administrator will consider any relevant evidence in the shared record between the parties that supports the claimant's receiving benefits."[73] Additionally, a district court limits its review to the four corners of the denial letters,[74] and thus "[the] denial letters themselves [must be] comprehensive in order to form a 'meaningful dialogue' for a full and fair review."[75]

By its own arguments, Premera concedes it did not engage with Plaintiff's provider opinions. It argues that, under *E.W.*, an "administrator is not required to engage provider opinions that do not contain information relevant to medical necessity of benefit claimed."[76] Premera asserts that "[t]here is no evidence of [the required] symptoms in the record," and that after notifying Plaintiff which symptoms were absent from the record that were necessary for residential treatment, "[t]here was nothing more for Premera to do unless Plaintiff identified

---

[70] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1300 (10th Cir. 2023) (internal quotation marks and citation omitted).

[71] *Id*. (internal quotation marks and citation omitted).

[72] *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1223 (10th Cir. 2023) (internal quotation marks and citation omitted).

[73] *Id*. (citation omitted).

[74] *D.K*, 67 F.4th at 1242 ("Review of the explanation provided to claimants must focus on the content of the denial letters.").

[75] *Id*.

[76] Docket No. 40, at 7

evidence of the symptoms that Premera identified as lacking [and] Premera had no reason to conclude that any symptoms existed that would support residential treatment."[77]

Defendant's arguments and reliance on *E.W.*, here, are misplaced and reflect Premera's failure to even consider the provider opinions. First, *E.W.* did not address an administrator's obligation to engage with opinions from a claimant's treating physicians, as that issue was not raised on appeal.[78] Second, *E.W.* stands for the proposition that a plan administrator's denial is not unreasoned for failure to cite to the medical record if it cites to the specific diagnostic criteria and highlights an absence of symptoms required to establish medical necessity under such criteria.[79] *E.W.* does not, however, stand for the proposition that a plan administrator can choose to ignore relevant evidence produced by a claimant.[80] Third, contrary to Premera's contention and unlike the facts of *E.W.*, Plaintiff's medical records and provider opinions undoubtedly contain relevant evidence that reasonably supports a finding of medical necessity, as shown below.

Alternatively, Defendant argues that it is not required to specifically address every opinion offered by the patient's providers. This is correct. There is no "blanket requirement that a

---

[77] *Id*. at 8; *see* Docket No. 48, at 6 ("Plaintiff identifies nothing in the record that meet these criteria, and there is none.").

[78] *E.W.*, 86 F.4th at 1300 ("Unlike *D.K.*, Plaintiffs do not argue on appeal that [the plan administrator] failed to engage with opinions from [the plaintiff's] treating physicians.").

[79] *See id*. at 1301.

[80] *Id.* (reaffirming the holding in *D.K.* wherein the court "determined that the administrator acted arbitrarily and capriciously by declining to follow [the plaintiff's provider opinions] without any explanation"); *see also Ian C.*, 87 F.4th at 1223–24 (holding that "[a]t minimum, [the plan administrator] was required to address [the plaintiff's] arguments and evidence of [the plaintiff's] substance abuse," and the failure to do so violated ERISA); *David P.*, 77 F.4th at 1310 (finding that the plan administrator violated ERISA by "fail[ing] to engage with the recommendations made by [the plaintiff's] treating care givers that she required treatment in a residential care setting").

health administrator considering a claim for health benefits must seek out all treating care givers' opinions found in a claimant's medical records and explain whether or not the plan administrator agrees with each of those opinions and why."[81] In fact, "an administrator is not required to defer to the opinions of a treating physician."[82] But, Tenth Circuit case law makes it clear that:

> [A plan administrator's] duties under ERISA require them to address medical opinions, particularly those which may contradict their findings. This is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence from medical opinions, the reviewer must respond to those opinions.[83]

In other words, "a reviewer may not arbitrarily refuse to credit opinions if they constitute reliable evidence from the claimant."[84] Medical opinions "are regularly proffered as proof of a claim."[85]

Upon review of the record, the Court finds that the information submitted by Plaintiff on appeal, specifically the provider opinion letters, are reliable and relevant to the determination of medical necessity and that Premera wholly failed to engage with and consider such evidence, and thereby acted in a manner that was arbitrary and capricious.

First, regarding severe functional impairment, a claimant may demonstrate an inability or unwillingness to follow instructions or negotiate needs. InterQual defines this as including patients who "require constant redirection or intervention," such as "patients [who] may be

---

[81] *David P.*, 77 F.4th at 1312.

[82] *D.K.*, 67 F.4th at 1237.

[83] *Id.* at 1241 ("In refusing to address the treating physician opinions presented to it which could have confirmed [the plaintiff's] need for benefits, United acted arbitrarily and capriciously.").

[84] *David P.*, 77 F.4th at 1311 (internal quotation marks and citation omitted); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003) ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinion of a treating physician.").

[85] *David P.*, 77 F.4th at 1311 (internal quotation marks and citation omitted).

unable or unwilling to follow the simplest directions (e.g., go to their room, take their medications, and take a shower), request assistance when needed, or negotiate for themselves."[86]

There is an overwhelming amount of evidence supporting this criterion. Regarding an inability or unwillingness to follow instructions or directions, Dr. Judice stated that her "experience with E.L. was that he was non-compliant with school, non-complaint with his parents' requests, non-compliant with medication, and non-complaint in therapy."[87] For example, "[h]e refused to go to school and when at school, he refused to interact with teachers, staff, and other students. When it was time to do work at school, he would sneak off."[88] Mr. Kemtrup stated that E.L. "would not engage with treatment, not talk during sessions, miss sessions, and avoid engagement with family and school."[89]

Regarding an unwillingness or inability to request assistance or negotiate needs, Dr. Judice stated that "[E.L.] described getting overwhelmingly anxious and panicky but said he didn't know why," "he used all his resources to undermine all the best efforts of anyone trying to help him," and "[h]e exploited people's empathy to manipulate them to do what his ill mind wanted."[90] For example, Dr. Judice explained that, on several occasions, he would have to call E.L. to even get him out of bed and that he would threaten suicide when pushed too far.[91] Dr. Judice also stated that "[E.L.] didn't want treatment as expressed by both his words and behaviors."[92] Mr. Kemptrup stated that E.L. "was more and more unable to speak with me or his

---

[86] Docket No. 52-3, at 8 (SEALED).

[87] *Id.* at 314.

[88] Docket No. 52-4, at 203 (SEALED).

[89] *Id.* at 209.

[90] *Id.* at 203, 04.

[91] *Id.* at 203.

[92] *Id.* at 204.

parents about growing feelings of depression and anxiety."[93] Dr. LaFollette's evaluation stated that it may be harder for others to see that E.L. is struggling because he can "talk his way out of things" and "sound like he understands concepts[,] that he may [actually] not."[94] Dr. LaFollette further stated that "[E.L] feels quite overwhelmed by day-to-day responsibilities and demands; he instead mulls over these fears and worries rather than proactively addressing them."[95]

Discharge notes from blueFire, as reflected in Premera's own clinic utilization review notes created in response to Plaintiff's preauthorization request, state: "[E.L. k]nows that he needed support for his anxiety and depression but was afraid to ask" and that "[h]e knew his parents were enabling him, but it was working for him so he didn't do much to change it."[96]

Second, regarding an inadequate support system, a claimant may demonstrate that their support system is unable to manage the intensity of their symptoms or ensure safety. There is substantial evidence that E.L.'s parents were unable to do so. For example, when E.O. tried "setting firm limits with him," Dr. Judice explained that E.L. would respond by running to his father's home and telling him that he felt unsafe and could not go back.[97] Additionally, in September and November of 2021, E.L. threatened suicide on multiple occasions, and sent a text message to E.O. stating: "I feel terrible. You do so much for me and I am grateful but I just can't explain why I don't feel comfortable or safe with you. I don't understand and I wish I had the willpower to kill myself."[98]

---

[93] *Id*. at 209.

[94] *Id*. at 116.

[95] *Id*. at 115.

[96] Docket No. 52-1, at 154 (SEALED).

[97] Docket No. 52-4, at 204 (SEALED).

[98] *Id*. at 94.

Dr. Judice, Ms. Adeosum, Dr. LaFollette, and Mr. Kemtrup all opined that E.L. needed around-the-clock care—something that E.L.'s parents could not provide at home. Specifically, Dr. Judice noted Dr. LaFollette's opinion that "staying at home with his parents is not the right place for [E.L.]."[99] Mr. Kemtrup stated that "[E.L.'s] parents and [he] tried everything [they] could to intervene," but noted his condition continued to deteriorate and recommended "a higher level of more comprehensive care" that outpatient individual therapy could not provide.[100] Ms. Adeosun recommended "E.L. not return home until he has the skills to manage his mental health symptoms."[101] Dr. LaFollete concluded that "[E.L.] needs close monitoring for safety."[102]

E.L's mother stated that "[E.L.] was non-communicative with [her and his father]" and that "[they] did not have the skills, training, or expertise to help [E.L.] while he was in the home environment."[103] As stated above, blueFire noted that "E.L. knew his parents were enabling him, but it was working for him, so he didn't do much to change it."[104] BlueFire also recommended that E.L. transition immediately to residential treatment and that "[r]eturning [E.L.] home prematurely is contraindicated and would likely recreate previous patterns of behavior."[105]

Third, regarding inability to be managed safely within the community, a claimant may show repetitive angry outbursts causing harm to self or others or property; or repetitive moderately aggressive behavior without injury to another, or sexually inappropriate behavior, where the patient was unsuccessful in meeting treatment plans goals in less intensive level of

---

[99] *Id*. at 204.

[100] *Id*. at 209.

[101] *Id*. at 207.

[102] *Id*. at 119.

[103] Docket No. 52, at 64 (SEALED).

[104] Docket No. 52-1, at 154 (SEALED).

[105] Docket No. 52-4, at 131 (SEALED).

care. InterQual further defines angry outburst as including "throwing . . . items,"[106] and moderate aggression as including "physical action using inanimate objections" such as "throwing a chair," but also includes "verbal threats."[107]

In Plaintiff's administrative appeal, E.O. describes that on multiple occasions, E.L. acted in a "violent threatening manner" toward her and E.L's father, including throwing his phone, which on one occasion "barely miss[ed E.O.'s] head."[108] Dr. Lafollette's evaluation stated that [E.L.] "has always struggled with temper tantrums, which, as he has aged, have developed into instances of rage, with verbal aggression and throwing objects out of frustration."[109] This evaluation further revealed that E.L. endorsed having thoughts of suicide every two weeks, and that he indicated the following items were "true" for him: "I think everyone would be better off if I were dead. More and more often I have thoughts of ending my life. Killing myself might be the easiest way to solve my problems. I've given thought to how and when I might commit suicide."[110]

There is also some evidence of sexually inappropriate behavior. While enrolled at Gateway, E.L. reported to his counselors that he engaged in oral sex on two separate occasions with another Gateway student.[111] A couple months thereafter, staff noted that E.L. "seem[ed] to be slightly flirty" with a different Gateway student and discussed this concern with E.L. "considering [his] sexual behaviors with a past peer while in treatment."[112]

---

[106] Docket No. 52-3, at 9 (SEALED).

[107] *Id*. at 11.

[108] Docket No. 52, at 51 (SEALED).

[109] Docket No. 52-4, at 100 (SEALED).

[110] *Id*. at 106.

[111] Docket No. 52-7, at 95 (SEALED).

[112] *Id*. at 111.

The record also supports that E.L. was unsuccessful in meeting treatment plan goals at less intensive levels of care. E.L. attended three different high schools, all of which had programs designed specifically for students with executive functioning challenges, each unsuccessful. E.L. met with three different therapists, each unsuccessful. Mr. Kemtrup concluded that E.L.'s condition had digressed such that "he did not benefit enough from individual therapy to continue treatment and needed a higher level of more comprehensive care that could not be easily provided on an outpatient basis."[113] Dr. Judice, who met with E.L. twice a week until his admission to blueFire, found that "he continued to worsen" and that "his illness was deeply rooted and resistant to treatment." Dr. Judice then opined that "the only way to treat such a deeply rooted illness," and "the only way that [E.L.'s] treatment could have any traction" would be in "residential treatment."[114] Dr LaFollette found that "[E.L.'s] depression and anxiety ha[d] grown substantially . . . [h]e ha[d] become increasingly isolated, irritable, . . . and [had a] growing suicidal ideation."[115] When E.L. was admitted into Gateway, Dr. Zehnder performed a psychiatric evaluation of E.L. where it was noted in E.L.'s history of present illness that "[t]wo times per week therapy with [sic] psychiatric made no difference. He wasn't treatable in outpatient setting because he wouldn't talk."[116]

Accordingly, there is reliable evidence from E.L.'s medical history and treating physicians' opinions that reasonably supports an award of benefits. Thus, Defendant's contentions that: "Premera had no reason to conclude that any symptoms existed that would support residential treatment," or "Premera did not need to engage in the provider letters

---

[113] Docket No. 52-4, at 209 (SEALED).

[114] *Id*. at 203–04.

[115] *Id.* at 117.

[116] Docket No. 52-8, at 56 (SEALED).

24

[because they] provided no contrary evidence," are blatantly contradicted by the record and establish Premera's failure to consider the evidence made on appeal. Any discussion, or even acknowledgment of Plaintiff's medical records and treating physicians' opinions are absent in the Second Denial Letter.

Rather than perform its statutory and fiduciary duties to provide a full and fair review by, at minimum, considering the information supplied by Plaintiff on appeal, Premera erroneously maintains that the record is devoid of any relevant or reliable evidence of medical necessity. This argument is strikingly similar to that in *David P*, described below:

> [The plan administrator] indicated that there was no clinical information indicating that [the plaintiff] needed treatment in [a residential treatment center]. [The plaintiff] responded by pointing out opinions from several of [the plaintiff's] care givers that she did require treatment at the [residential treatment level]. [The plan administrator] nevertheless, never addressed those opinions at all but instead inaccurately continued to assert that there [was] no information indicating the [the plaintiff] needed residential care.[117]

The Tenth Circuit concluded that "[b]y simply ignoring the treating care givers opinions, after [the plaintiff] had specifically pointed them out, [the plan administrator] deprived [the plaintiff] of the dialogue ERISA requires . . . which is necessary for the statutorily-required 'full and fair' administrative review."[118]

Premera argues at length that Plaintiff failed to carry her burden of establishing medical necessity—a convenient position to take when Premera itself excluded the very evidence that would have demonstrated it. Regardless, at this stage of the inquiry, the question is not whether the information provided by Plaintiff establishes medical necessity, but whether such information, including provider opinions, contains reliable counterevidence thereby triggering

---

[117] *David P.*, 77 F.4th at 1312.

[118] *Id.* at 1311.

Premera's duty to engage with it. Again, Premera need not address every single medical opinion offered by Plaintiff or accord special weight to such opinions,[119] and can elect to credit more contemporaneous evidence over the information supplied by Plaintiff. But "[p]lan administrators cannot shut their eyes to readily available information that may confirm the beneficiary's theory of entitlement."[120] The record before the Court establishes that is exactly what Premera did.

Now, in litigation, Premera seeks to specifically engage with Plaintiff's providers' medical opinions in a manner it failed to do in the administrative appeal process. First, Premera contends that all of the provider opinion letters are "obsolete" and "irrelevant" because they were formed around either three months, four months, or a year-and-a-half prior to admission to Gateway.[121] Second, Defendant argues that because the letters do not specifically address the medical necessity criteria, they "are not probative of the medical necessity issue."[122] Third, that Dr. Zehnder's evaluation at Gateway and the independent reviewer's conclusions support Premera's denial. Fourth, that "Premera relied on the most probative, contemporaneous evidence available—the real time evaluations issued by blueFire and Gateway."[123]

These rationales were never communicated to Plaintiff and thus are late and will not be considered in determining whether Defendant properly provided Plaintiff with a full and fair

---

[119] *See Black & Decker Disability Plan*, 538 U.S. at 831.

[120] *Id*. (internal quotation and citation omitted).

[121] Docket No. 33, at 22 ("By the time E.L. was admitted to Gateway, the contents of the letters of medical necessity were obsolete."); Docket No. 40, at 10 ("The four-month interval between Dr. Judice's last evaluation and E.L.'s admission to Gateway makes Dr. Justice's [sic] opinion regarding residential treatment irrelevant.").

[122] Docket No. 48, at 5.

[123] *Id*. at 11; while Premera stated that it relied on blueFire and Gateway records in reaching its decision, it did not communicate to Plaintiff that it credited those records over others because they are the most contemporaneous and thus, in Premera's view, the most probative of medical necessity.

review. "ERISA regulations require denial letters . . . to be comprehensive," and the Tenth Circuit has repeatedly held that "in order to form a 'meaningful dialogue' for a full and fair review . . . [r]eview of the explanation provided to claimants must focus on the content of the denial letters."[124] "It cannot be that the depth of an administrator's engagement with medical opinion would be revealed only when the record is presented for litigation."[125] "This is the core of meaningful dialogue," and "how civilized people communicate with each other regarding important matters."[126] By failing to consider and engage with Plaintiff's provider opinions, Premera deprived Plaintiff of a full and fair review.

Notwithstanding, Defendant's arguments and rationales reflect the egregiousness of its procedural violations and thus, to the extent they were offered to explain why Premera determined it did not need to engage with or consider Plaintiff's treating physicians' opinions at all, the Court will address each in turn. However, to the extent the arguments above are Premera's rationales for why it credited more contemporaneous evidence over E.L.'s medical history and provider opinions, ERISA simply requires such rationales to be communicated to Plaintiff in the administrative appeal process.

Regarding relevance of the medical opinions, Defendant argues that "[b]y the time E.L. was admitted into Gateway, the contents of the letters of medical necessity were obsolete"[127] because Dr. LaFollette's, Mr. Kemtrup's and Dr. Judice's evaluations or last interactions with

---

[124] *D.K.*, 67 F.4th at 1242.

[125] *Id.* at 1241.

[126] *Id.* (internal quotation marks and citation omitted).

[127] Docket No. 33, at 22.

E.L. occurred "before the relevant period."[128] In support, Defendant cites *John R. v. United Behavioral Health*.[129]

However, *John R.* strongly undercuts Defendant's argument. There, the court held that the plaintiff's psychological report and three opinion letters, formed either three months, five months, or two and a half years prior, were relevant and "offer[ed] one data set" that was to be considered "when making a coverage determination."[130] Regarding medical necessity, however, the court concluded that the report and three letters "do not necessarily lead to the conclusion" that treatment was medically necessary, and that merely reaching a conclusion contrary to the letters "is not evidence that the reviewers disregarded those opinions."[131]

Defendant does not cite any case law, authority, or otherwise provide any reasoning as to what the supposed "relevant period" is. By contrast, the relevant InterQual criteria make no mention of, nor impose any requirement that evidence must be from within a certain time frame, except for one criterion—an inability to be managed safely within the community. Even then, this criterion simply requires evidence of symptoms that are persistent or repetitive over at least six months. Accordingly, InterQual necessarily implies that, at the very minimum, evidence within six months is relevant to and probative of medical necessity with regard to that criterion.

Mr. Kemtrup last saw Plaintiff a year and a half prior to admission into Gateway. Dr. LaFollette performed her evaluation of E.L. a little over four months prior to admission. Lastly, Dr. Judice last interacted with E.L. around two-and-a-half months prior to his admission to Gateway. As discussed above, Premera may choose to credit other more contemporaneous

---

[128] Docket No. 48, at 3, 11

[129] No. 2:18-CV-35-TC-DAO, 2021 WL 4393422 (D. Utah Sept. 24, 2021).

[130] *Id*. at *14.

[131] *Id*.

evidence over Plaintiff's providers' opinions. However, the fact that Plaintiff's providers last saw E.L. around a few months, and even a year-and-a-half, prior to his admission does not make those records "irrelevant" such that Premera can refuse to credit them at all. This is especially true considering that Dr. Judice was E.L.'s treating psychiatrist for just under six years. To assert that a medical opinion, formed after almost six years of treatment, is "obsolete" and "irrelevant" simply because the provider last saw the patient less than three months prior to admission is unreasonable, arbitrary and capricious, and therefore violates Premera's fiduciary duties "to see that those entitled to benefits receive them," and to "consider the interests of deserving beneficiaries as it would its own."[132]

Premera also asserts the letters are "absent of any analysis of medical necessity" and that "Plaintiff fail[ed] to identify any evidence of the symptoms that Premera said were required for residential treatment."[133] These assertions are false. Although Dr. Judice's and Dr. LaFollette's letters do not address specific InterQual criteria, they discuss symptoms relevant to the InterQual criteria and opine as to why they believe residential treatment is medically necessary.[134] Further, the letters undoubtedly contain evidence of symptoms that are relevant to and reasonably support medical necessity and Plaintiff specifically highlighted such evidence in her appeal.[135]

"Although the insured ultimately carries the burden of showing [they are] entitled to benefits, the plan administrator has a fiduciary duty to the insured to conduct an investigation and to seek out the information necessary for a fair and accurate assessment of the claim."[136] "In

---

[132] *Gaither*, 394 F.3d at 807–08.

[133] Docket No. 40, at 5.

[134] *See* Docket No. 52-4, at 202–04 (SEALED); Docket No. 52-4, at 99–122 (SEALED).

[135] *See* Docket No. 52, at 45–126 (SEALED).

[136] *Rasenack*, 585 F.3d at 1324.

other words, if the plan administrator cannot show that it conducted a reasonable and well communicated investigation, a court can find its conduct arbitrary and capricious regardless of the facts on the record."[137] Here, the Court finds Premera did not conduct a reasonable and well-communicated investigation because, had it done so, it would have found evidence of symptoms relevant to medical necessity and would not have made false statements regarding a lack of evidence. The Court finds that Premera's failure to do so was arbitrary and capricious.

Premera also argues that Dr. Zehnder's evaluation and the independent reviewer's decision to uphold the denial confirms that Premera was correct. However, Premera's decision to deny benefits, even if supported by the independent reviewer, does not excuse it from complying with its duties to engage in a meaningful dialogue and provide a full and fair review. In *David P.*, the court rejected the argument that benefit denials should be upheld because the independent external reviewer reached the same decision.[138] There, the district court reversed the denial of benefits "not because there was insufficient evidence to support [the plan administrator's] decision to deny benefits, but because [the plan administrator] abused its discretion by inadequately processing [the plaintiffs'] claims."[139] The Tenth Circuit affirmed, holding that the external reviews together with its own review and internal notes "cannot cure [the] deficient claim processing."[140]

---

[137] *Theo M. v. Beacon Health Options*, 631 F. Supp. 3d 1087, 1105 (D. Utah 2022).

[138] *David P.*, 77 F.4th at 1314.

[139] *Id.*

[140] *Id*; *see also Ian C.*, 87 F.4th at 1226 ("United cannot avail itself of its peer-to-peer conversations with . . . staff, . . . case notes, and the like to defend its decision because these materials were not conveyed to [the plaintiff] in the denial letters.").

Lastly, Premera contends it "relied on the most probative, contemporaneous evidence available—the real time evaluations issued by blueFire and Gateway."[141] But, Premera's error is not which evidence it decided to credit, but rather its refusal to engage with or consider Plaintiff's evidence, and rationales for not doing so, when, as shown above, such evidence reasonably supports an award of benefits.

In conclusion, the Court finds that Defendant Premera violated ERISA when it failed to cite the Plan; made conclusory health statements without supporting citations, reasoning, or clinical judgment; unreasonably applied InterQual criteria; and failed to engage with or consider the provider opinions submitted on appeal.

### e. Remedy

Defendant contends that even if it violated ERISA, the record still supports that residential treatment was not medically necessary, and that the only remedy available to Plaintiff is remand. "[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits."[142] Whether to award benefits retroactively or remand hinges on the nature of the flaws in the administrator's decision.[143] "Where the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision, then the

---

[141] Docket No. 48, at 11.

[142] *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006) (internal quotation marks and citation omitted); *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 833 (10th Cir. 2008) ("A showing that the administrator failed to follow ERISA procedures . . . provides a basis for reversal separate from that provided by de novo review of the merits of the claim.").

[143] *See David P.*, 77 F.4th at 1315.

proper remedy is to remand the case. In contrast, if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."[144] The Court may also award benefits "if the evidence clearly shows that the administrator's actions were arbitrary and capricious,"[145] or where remand will "provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record."[146]

The Court finds that Premera's actions were arbitrary and capricious and will therefore award retroactive benefits for E.L.'s stay at Gateway in the amount equivalent to what would have been covered under the Plan had Premera found that treatment was medically necessary.

Premera committed four serious procedural violations. By its own argument, Premera concedes that it did not engage with, or consider the provider opinions submitted on appeal because it determined they were "obsolete," and "not probative" of medical necessity. Not only did Premera admit to not performing its core duty to provide a full and fair review, the reasons articulated for not doing so are egregious.

Specifically, the Court takes issue with Premera's refusal to consider Dr. LaFollette's and Dr. Judice's opinions. It is beyond debate that those opinions contain evidence relevant to medical necessity and the time of their formation—only a few months prior to admission—does not give Premera the option to ignore them. This is especially true considering that Dr. Judice was E.L.'s psychiatrist for close to six years who saw him twice a week prior to his admission,

---

[144] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (internal quotation marks and citation omitted) (cleaned up).

[145] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1289 (10th Cir. 2002).

[146] *Carlile v. Reliance Standard Ins. Co.*, 385 F. Supp. 3d 1180, 1189 (D. Utah 2019); *see also D.K.*, 67 F.4th at 1243 ("[R]emand to an insurer is not appropriate if it serves primarily to give the defendants an opportunity to retool a defective appeals system.") (internal quotations marks and citation omitted) (cleaned up).

and as a result, Dr. Judice's opinion contains unique and valuable insight into E.L.'s medical condition. To call his opinion obsolete or irrelevant, or to falsely claim that he, or the other providers, did not discuss evidence relevant to medical necessity is arbitrary and capricious and flies in the face of Premera's fiduciary duty to conduct its duties "solely in the interest of the participants and beneficiaries . . . and for the exclusive purpose of . . . providing benefits to participants and their beneficiaries."[147]

The Court also finds that remand would provide Premera with an opportunity to re-evaluate the claim based on rationales raised for the first time in litigation that were never communicated to Plaintiff, as discussed above. "The purpose of ERISA's claims-processing requirements is to provide benefits claimants with meaningful dialogue with the administrator in order to prevent frivolous litigation, among other things."[148] Thus, permitting remand would give Prema a second "bite at the apple."[149]

Because the Court will grant Plaintiff's Motion on her ERISA claim, Plaintiff's Parity Act claim is moot. Additionally, the Court will order that parties provide additional briefing on prejudgment interest, attorney fees, and costs under 29 U.S.C. § 1132(g).

## IV.  CONCLUSION

For the forgoing reasons, it is hereby

---

[147] 29 U.S.C § 1104(A)(1)(a)(i).

[148] *David P.*, 77 F.4th at 1315.

[149] *D.K.*, 67 F.4th at 1243 (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001) ("[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts.")); *see also D.B. v. United UnitedHealthcare Ins. Co.*, No. 1:21-CV-00098-JNP-CMR, 2026 WL 851250, at *11 (D. Utah Mar. 27, 2026) (awarding retroactive benefits after repeated violative denials even though the court was "unable to definitively find that . . . treatment was necessary").

ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 32) is GRANTED in part and DENIED in part as moot. It is further

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 33) is DENIED. It is further

ORDERED that Defendant award Plaintiff an amount equivalent to what Premera would have paid out under the terms of the Plan had Premera found that treatment was medically necessary. It is further

ORDERED that Plaintiff file additional briefing related to prejudgment interest, attorney fees, and costs within fourteen (14) days of the date of this Order. Defendant must file a response within fourteen (14) days from the date of Plaintiff's filing.

DATED June 30, 2026.

BY THE COURT:

Ted Stewart
United States District Judge